AON FINANCIAL PRODUCTS, INC., a Delaware Corporation, and Aon Corporation, a Delaware Corporation, Plaintiffs–Appellees,

v.

SOCIÉTÉ GÉNÉRALE, a French Banking Institution, Defendant–Appellant.

Docket No. 06–1080–CV.

United States Court of Appeals, Second Circuit.

Argued: Oct. 6, 2006.

Decided: Feb. 5, 2007.

David M. Lindley, Pillsbury Winthrop Shaw Pittman LLP (Eric Fishman, of counsel), New York, NY, for Defendant–Appellant.

Christopher Landau, Kirkland & Ellis LLP (Jeffrey B. Wall, of counsel), Washington, DC, for Plaintiffs–Appellees.

Joan A. Stumpf, Cadwalader, Wickersham & Taft LLP, New York, NY, for amicus curiae The International Swaps and Derivatives Association, Inc.

Before: FEINBERG, CABRANES, and SACK, Circuit Judges.

SACK, Circuit Judge:

On August 8, 2000, the plaintiffs, Aon Corp. and its subsidiary, Aon Financial Products, Inc. ("AFP", together "Aon"), brought suit in the United States District Court for the Southern District of New York seeking recovery in breach of contract against Société Générale ("SG") under a $10 million credit default swap agreement[1] between them dated March 8, 1999 (the "Aon/SG CDS contract").

The Aon/SG CDS contract provides that if a "Credit Event" occurs before the defined "Termination Date" of the agreement and Aon notifies SG of that Credit Event, then SG must pay Aon $10 million. Aon contends that a Credit Event occurred when the Government Service Insurance System ("GSIS"), an agency of the Philippine Government, defaulted on a surety bond that GSIS had issued to cover investments in a project with respect to which Bear Stearns International Limited ("BSIL") later made a loan. BSIL, in an effort to protect itself against the risk of GSIS defaulting on the bond, entered into a Credit Default Swap Agreement with Aon (the "BSIL/Aon CDS contract"). In a separate suit, the district court determined that a Credit Event occurred under the BSIL/Aon CDS contract when GSIS defaulted on the surety bond. *See Ursa Minor Ltd. v. Aon Financial Products, Inc.*, 2000 WL 1010278, at *6, 2000 U.S. Dist. LEXIS 10166, *19–*20 (S.D.N.Y. July 21, 2000) ("*Ursa Minor*") (Allen G. Schwartz, *Judge*), *aff'd*, 7 Fed.Appx. 129 (2d Cir.2001). Aon argues that if a Credit Event occurred under the BSIL/Aon CDS contract, then a Credit Event also must have occurred under the Aon/SG CDS contract that is the subject of this suit, and that Aon therefore was entitled to payment thereunder. The issue on this appeal is whether a Credit Event occurred under any of the definitions set forth in the Aon/SG CDS contract such that SG's refusal to pay Aon constituted breach of contract. We disagree with the determination by the district court (George B. Daniels, *Judge*) that a Credit Event occurred within the meaning of that term in

---

1. "A credit default swap is the most common form of credit derivative, i.e., a contract which transfers credit risk from a protection buyer to a credit protection seller." *Eternity Global Master Fund Ltd. v. Morgan Guar.*

*Trust Co. of N.Y.*, 375 F.3d 168, 171–72 (2d Cir.2004) (internal quotation marks, footnote, and brackets omitted). *See also id.* at 171–74 (discussing credit default swap terminology and documentation).

the Aon/SG CDS contract, which prompted the court to grant the plaintiffs' motion for summary judgment and deny the defendant's motion for judgment on the pleadings. We therefore reverse the judgment of the district court and enter judgment in favor of SG.

## BACKGROUND

This case arises out of one of a series of transactions related to the financing of a condominium complex in the Philippines. In 1999, BSIL agreed to loan Ecobel Land, Inc. ("Ecobel") $9.3 million to build the condominiums. Ecobel was obligated under this agreement to repay BSIL $10 million on March 7, 2000. As a condition precedent to that loan, BSIL required that Ecobel procure a surety bond from GSIS that guaranteed repayment of the full $10 million in the event that Ecobel defaulted on its loan. GSIS then purportedly transferred to BSIL as obligee a $10 million GSIS surety bond covering Ecobel's borrowings for the condominium project dated March 11, 1998, but apparently issued on February 5, 1999 (the "Surety Bond"), which listed Ecobel as principal and Philippine Veterans Bank as obligee. *See Ursa Minor*, 2000 WL 1010278, at *1, 2000 U.S. Dist. LEXIS 10166, at *4–*5.[2] Section 9

of the statute establishing GSIS states that "the government of the Republic of the Philippines ... guarantees the fulfillment of the obligations of [GSIS] when and as they shall become due." An Act to Create and Establish a "Property Insurance Fund" and to Provide for Its Administration and for Other Purposes, Rep. Act No. 656, § 9 (1951) (Phil.).

In order to protect itself against the risk of GSIS defaulting on the Surety Bond, BSIL entered into the BSIL/Aon CDS contract on February 4, 1999.[3] According to the agreement, Aon promised to pay BSIL $10 million upon the occurrence of a "Credit Event," which the contract defined as a "Failure to Pay," that is, "the failure by [GSIS] to make, when due, any payments under the Obligations for whatever reason or cause." BSIL/Aon CDS contract, dated Feb. 4, 1999, at 3, 11.[4] The only "Obligation" referred to in the agreement was the Surety Bond. For this credit protection, BSIL paid Aon $425,000.

To reduce its own risk exposure, on February 9, 1999, Aon entered into a separate credit default swap agreement with SG (the "Aon/SG CDS contract"). In it, SG promised to pay Aon $10 million upon the occurrence of a "Credit Event," defined as one of five occurrences: a "Fail-

---

**2.** As the *Ursa Minor* court explained, the nature of the Surety Bond and of BSIL's status as obligee thereunder was a matter of some dispute. 2000 WL 1010278, at *1 & *1 n. 2, 2000 U.S. Dist. LEXIS 10166, at *4–*5 & *5 n. 2. The validity of the Surety Bond and of its assignment to BSIL is, however, not relevant to the issues on this appeal.

**3.** AFP entered into the agreement, which Aon Corp. guaranteed. The distinction between AFP and Aon Corp. is not relevant to the issues on appeal.

**4.** The document that defines "Credit Event," "Failure to Pay," and other relevant terms is known in the industry as the "confirmation." Parties to credit derivative swaps enter into a

standard form "Master Agreement" created by the International Swaps and Derivatives Association, Inc. ("ISDA"), which governs the legal and credit relationship between the parties and other aspects of the agreement. Br. of *amicus curiae* ISDA, at 8 (citing http://www.isda.org (follow "Education" hyperlink; then follow "Derivatives Documentation" hyperlink)). Supplemental documents, such as confirmations, set forth economic terms and other transaction-specific modifications to the Master Agreement and other standard documents. The provisions of the BSIL/Aon CDS contract and the Aon/SG CDS contract that are at issue here are both contained in "confirmations," which incorporate materially similar versions of the ISDA Master Agreement.

ure to Pay," a "Sovereign Event," a "Cross Default," a "Repudiation," or a "Restructuring." But whereas the BSIL/Aon CDS contract defined "Reference Entity," whose obligations were the subject of the swap, as GSIS and any successors and assigns, the Aon/SG CDS contract defined "Reference Entity" as "Republic of Philippines and any successors." Similarly, while the "Reference Obligation," which was the subject of the BSIL/Aon CDS contract, was GSIS's $10 million Surety Bond, the "Reference Obligation" of the Aon/SG CDS contract was a $500 million Republic of Philippines treasury bond (US718286AE71, coupon rate 8.875%, maturing on April 15, 2008). For the credit protection under the Aon/SG CDS contract, Aon paid SG $328,000, nearly $100,000 less than the amount that BSIL had paid Aon for protection under the BSIL/Aon CDS contract.

About one year later, in March 2000, Ecobel defaulted on its BSIL loan. On March 9, 2000, Bankers Trustee Company, Ltd. ("Bankers"), to whom BSIL had assigned its rights under the various agreements relating to the loan, notified Aon that it had received a letter from GSIS stating that it did not intend to pay Bankers on the bond because it had not been appropriately authorized on GSIS's behalf. Aon responded the following day that it would not pay Bankers under the BSIL/Aon CDS contract because GSIS's statement that it intended to refuse to honor the Surety Bond did not constitute a "Credit Event" under the BSIL/Aon agreement. Aon then initiated a declaratory judgment action in the United States District Court for the Northern District of Illinois seeking clarification of its rights as against BSIL and SG under the various agreements.

Before the Illinois litigation was resolved, however, BSIL's assignees filed suit against Aon in the United States District Court for the Southern District of New York. The district court granted summary judgment in the action in favor of the assignees. *Ursa Minor Ltd.*, 2000 WL 1010278, at \*12, 2000 U.S. Dist. LEXIS 10166, at \*39–\*40. The court concluded that the BSIL/Aon CDS contract specifically defined "Credit Event" as a failure *by GSIS*, the Reference Entity, to pay under the Surety Bond " 'for whatever reason or cause,' " *id.* at \*2, \*6, 2000 U.S. Dist. LEXIS 10166 at \*7, \*18, and that GSIS's default clearly satisfied that condition, *id.* at \*6, 2000 U.S. Dist. LEXIS 10166, at \*18. The court noted that in the BSIL/Aon CDS contract, Aon had waived the defense of any illegality of the GSIS Surety Bond. The court concluded that Aon "bore the risk of non-payment by GSIS, for 'whatever reason or cause,' including a justifiable refusal to pay." *Id.* at \*7, 2000 U.S. Dist. LEXIS 10166, at \*26.

On April 8, 2000, more than two months before the district court's decision in *Ursa Minor*, Aon filed this action in the same court, the United States District Court for the Southern District of New York, against SG, seeking payment of $10 million under the Aon/SG CDS contract. On October 3, 2000, SG moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), arguing principally that Aon had failed to allege a breach of the Aon/SG CDS contract because GSIS was not included in the definition of "Republic of Philippines," the Reference Entity of the Aon/SG CDS contract, and GSIS's default therefore did not constitute a Credit Event for the purposes of that agreement.

In response, Aon moved for summary judgment, contending first that the finding in *Ursa Minor* that a Credit Event had occurred for the purposes of the BSIL/Aon CDS contract, *Ursa Minor*, 2000 WL 1010278, at \*7, 2000 U.S. Dist. LEXIS

10166, at *22–*23, necessarily meant that a Credit Event had occurred for the purposes of the Aon/SG CDS contract. Aon argued that because both *Ursa Minor* and this litigation were based on the same "series of transactions" and "evidence regarding whether or not there was a failure to pay," and because SG was "in privity with Aon," SG was precluded from relitigating that factual issue. Aon Mot. for Summ. J. dated Oct. 18, 2000, at 6–7. Aon urged the court to reject SG's argument "that the cases are distinct because the verbiage in the swap contracts in certain sections are slightly different" because the key issue, whether a "Credit Event" had occurred, was the same in both cases. *Id.* at 9.

Second, Aon argued that SG was liable to Aon because a Credit Event occurred as a matter of law under the provision of the Aon/SG CDS contract defining a Credit Event as, *inter alia,* a "Sovereign Event" or a "Failure to Pay." In response to SG's argument that the GSIS default was not a Sovereign Event because the Republic of the Philippines and GSIS are separate entities, Aon asserted that the April 14, 2000, letter from the Philippine government refusing to honor its statutory guarantee of GSIS's obligations "did not deny that GSIS had authority to bind it [the Philippine government], ... nor does it assert that the GSIS and the Philippine government are separate and distinct entities ...." *Id.* at 11.

By order dated February 22, 2005, the district court denied SG's motion for judgment on the pleadings and granted Aon's counter-motion for summary judgment. The court decided that under the plain and unambiguous terms of the Aon/SG CDS contract, GSIS's default satisfied the definition of "Sovereign Event," and therefore constituted a Credit Event. *Aon Fin. Prods. & Aon Corp. v. Société Générale,* 2005 WL 427535, 2005 U.S. Dist. LEXIS 2719 (S.D.N.Y. Feb.22, 2005) (*"Société Générale "*). The court concluded that the definition of "Sovereign Event," which includes "a condition ... that has the effect of ... causing a failure to honour any obligation relating to ... the government of the Reference Entity ...," *id.* at *4, 2005 U.S. Dist. LEXIS 2719, at *16 (quoting the Aon/SG CDS contract) (ellipses in original), "requires only that GSIS'[s] act have the effect of causing a failure to honour an obligation *relating* to the Philippine government," *id.* at *5, 2005 U.S. Dist. LEXIS 2719, at *16 (emphasis in original).

The court further concluded that Aon's March 22, 2000, letter notifying SG that GSIS had declined to make payment on the Surety Bond constituted sufficient notice of the Credit Event under the agreement. *Id.* at *6, 2005 U.S. Dist. LEXIS 2719, at *20. The court therefore granted Aon's motion for summary judgment and denied SG's motion for judgment on the pleadings.

SG appeals.

## DISCUSSION

### I.  Standard of Review

■■■ "We review a district court's grant of summary judgment de novo, construing the evidence in the light most favorable to the nonmoving party and drawing all inferences and resolving all ambiguities in favor of the nonmoving party." *United Air Lines, Inc. v. Insurance Co. of State of Pa.,* 439 F.3d 128, 130 (2d Cir.2006) (citation and internal quotation marks omitted). Whether the contractual language is ambiguous is also a question of law subject to our de novo review. *Krumme v. WestPoint Stevens Inc.,* 238 F.3d 133, 139 (2d Cir.2000). And "[w]here the parties' intent is unam-

biguously conveyed by the plain meaning of the agreements, then interpretation is a matter of law, and we will review that interpretation *de novo*." *Id.* (citations and internal quotation marks omitted).

New York law governs the Aon/SG CDS contract according to its choice-of-law provision. No party disputes the applicability of New York law here.

## II. "Sovereign Event"

Credit default swaps are a method by which one party (the protection buyer) transfers risk to another party (the protection seller). In "emerging markets" such as the Philippines,

> [p]rotection buyers ... can use credit derivatives to manage particular market exposures and return-on-investment; and protection sellers ... generally use credit derivatives to earn income and diversify their own investment portfolios. Simply put, a credit default swap is a bilateral financial contract in which a protection buyer makes periodic payments to the protection seller, in return for a contingent payment if a predefined credit event occurs in the reference credit . . . .
>
> Often, the reference asset that the protection buyer delivers to the protection seller following a credit event is the instrument that is being hedged. But in emerging markets, an investor may calculate that a particular credit risk is reasonably correlated with the performance of the sovereign itself, so that ... the investor may seek to isolate and hedge country risk with credit default swaps written on some portion of the sovereign's outstanding debt.

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 172 (2d Cir.2004) (brackets, ellipses, quotation marks, and footnotes omitted).

CDS agreements are thus significantly different from insurance contracts. As *amicus* correctly points out, they "do not, and are not meant to, indemnify the buyer of protection against loss. Rather, CDS contracts allow parties to 'hedge' risk by buying and selling risks at different prices and with varying degrees of correlation." Br. of *amicus curiae* Int'l Swaps and Derivatives Ass'n, Inc. (ISDA), at 7 (footnote omitted). Aon bought from BSIL the risk of a "Credit Event" as defined by the BSIL/Aon CDS contract. With the Aon/SG CDS contract, Aon hedged the risk that it bought from BSIL by selling to SG the risk of a "Credit Event" as defined by the Aon/SG CDS contract. But the risk transferred *to* Aon and the risk transferred *by* it were not necessarily identical. The terms of each credit swap agreement independently define the risk being transferred.

■ To decide whether GSIS's failure to pay on the Surety Bond because GSIS took the position that it was not a legally binding obligation, an event that constituted a Credit Event as defined in the BSIL/Aon CDS contract, also constituted a "Credit Event" as defined in the Aon/SG CDS contract—the issue presently before us—we look first to the language of the contract. If it is unambiguous—which we think that it is—then "we are required to give effect to the contract as written." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir.1996) (citation and internal quotation marks omitted).

■ The Aon/SG CDS contract defines "Credit Event" as, *inter alia*, a "Sovereign Event," which is

> a condition which is created by or results from any act or failure to act by the government of the Reference Entity or any agency or regulatory authority thereof, including the central bank of the Reference Entity, that has the effect

of declaring a moratorium (whether de facto or de jure) on, or causing a failure to honour any obligation relating to, or cancelling or generally causing material changes to the terms and conditions of, any obligation issued by the government of the Reference Entity or the central bank of the Reference Entity.

Aon/SG CDS Contract at 7. The contract defines "Reference Entity" as "Republic of Philippines and any successors." *Id.* at 1. Thus, for purposes of our analysis, after redacting inapplicable language, the Aon/SG CDS Contract provides that an event is a "Sovereign Event" if it is "a condition ... created by or result[ing] from any act or failure to act by the government of [the Republic of Philippines and any Successors] or any agency or regulatory authority [thereof] ... that has the effect of ... causing a failure to honour any obligation relating to ... any obligation issued by the government of [the Republic of Philippines]."

The district court concluded that this definition "requires only that," to be a Credit Event, "GSIS'[s] act ha[s] the effect of causing a failure to honour an obligation *relating* to the Philippine government." *Société Générale*, 2005 WL 427535, at *5, 2005 U.S. Dist. LEXIS 2719, at *16 (emphasis in original). Similarly, Aon argues that "the contract ... defines Sovereign Event as, *inter alia*, a failure to honor any obligation 'relating to ... any obligation issued by the Reference Entity [i.e., the Philippine government].'" We disagree with Aon and the district court principally because we think that these interpretations ignore the crucial word "condition" at

the outset of the definition. GSIS's failure to pay on the Surety Bond may well have been a failure to act, or an event, but surely it was not a "condition."

Put another way, Aon asks us to conclude that the GSIS *default on the Surety Bond* constituted (1) an act or failure to act by an agency of the Philippine government (GSIS), which (2) created a "condition," which had the effect of causing a failure of (3) *GSIS to honor its obligation, the Surety Bond,* (4) which obligation relates to an obligation of the Philippine government.[5] But we do not think that the definition of Sovereign Event includes (a) the failure of a Philippine agency (GSIS) to honor its Surety Bond, thereby creating (b) a "condition" that in turn caused (c) the failure of the agency to honor the same Surety Bond, irrespective of whether the Surety Bond is an obligation that relates to an obligation of the Philippine government. The default was not a "condition" that caused the failure of GSIS to honor its obligation. Nor was it caused by an "act or failure to act by the Republic or its agency." It resulted from GSIS's decision that it was not legally bound to honor its putative obligation to pay. We do not think that GSIS's decision itself—its determination that it is not legally bound by the Surety Bond to pay—can be characterized as either "an act or failure to act" or as a "condition" within the ordinary meaning of those terms.

A literal reading of the Sovereign Event definition might suggest that the "act or failure to act" by the government of the Philippines that "had the effect of causing

---

**5.** Aon argues that the Surety Bond was an "obligation relating to ... an[ ] obligation issued by the government of the [Republic of the Philippines]" because of the Philippine government's statutory guaranty that it will pay GSIS's debts. *See Société Générale*, 2005 WL 427535, at *5 n. 11, 2005 U.S. Dist.

LEXIS 2719, at *16 n. 11. We need not decide whether GSIS's obligation under the Surety Bond "relat[ed] to" any obligation of the Government of the Philippines, because, under our analysis, the result is the same in either case.

[the] failure [of GSIS] to honour" the Surety Bond was something other than the failure to pay on the Surety Bond itself. Hypothetically, for example, the "act" might have been the issuance of GSIS's letter to BSIL's assignees denying liability. Even if that were what Aon's complaint said,[6] the argument would fail. The letter was, to be sure, an "act." But it did not *create* a separate "condition" which in turn *caused* the default on the Surety Bond.

Moreover, an "act or failure to act" in the context of a "Sovereign Event" seems to refer to such large-scale events as the restructuring of the Sovereign's—i.e., the government's—debt, taken in its capacity as a sovereign. The act of debt restructuring by a sovereign may well cause—indeed may be expected to cause—a general "condition" throughout the country (e.g., currency devaluation, restriction on exports of U.S. dollars, and the like) that in turn results in one or more defaults on one or more particular obligations against which an entity doing business with or within the country would want to protect itself. *Cf. Eternity Global*, 375 F.3d at 170 (addressing the operation of CDS contracts where "the government of the Republic of Argentina, in the grip of economic crisis, initiated a 'voluntary debt exchange' "). There was no such act or resulting condition here.

Aon points out that the *Ursa Minor* district court held that GSIS's default in March 2000 qualified as a Credit Event under the BSIL/Aon CDS contract. Compl. ¶ 36. Indeed the court did so hold:

> The definition of "Credit Event" [in the BSIL/Aon CDS contract] specifically includes failure by GSIS to pay under the [Surety] Bond "for whatever reason or cause." Plaintiffs allege that GSIS'[s] refusal to make payment under the Bond amounted to a Credit Event, that [Aon] was given proper notice and that [Aon's] refusal to pay constituted a default triggering Aon's obligations under the Guarantee.

*Ursa Minor*, 2000 WL 1010278, at *6, 2000 U.S. Dist. LEXIS 10166, at *18. The court then ruled against Aon because the GSIS default constituted a Credit Event, which the BSIL/Aon CDS contract defined as, *inter alia*, a "Failure to Pay," and because Aon "ha[d] an obligation to pay irrespective of the Bond's potential invalidity or enforceability with respect to GSIS." *Id.* at *7, 2000 U.S. Dist. LEXIS 10166, at *22. The *Ursa Minor* district court never addressed the possibility that the GSIS default may have been a "Sovereign Event"—under the BSIL/Aon CDS contract, let alone under the Aon/SG CDS contract before us. This is hardly surprising inasmuch as the BSIL/Aon CDS contract did not define "Credit Event" to include "Sovereign Event" as the Aon/SG CDS contract did.

Yet Aon contends that the *Ursa Minor* court's determination that a Credit Event occurred under the BSIL/Aon CDS contract necessarily means that a Credit Event occurred under the Aon/SG CDS contract.[7] But it does not follow from the

---

6. The complaint asserts simply that GSIS denied the validity of the Bond and failed to pay. It states that "[b]y virtue of GSIS'[s] dishonor of the purported surety bond to BSIL … [Aon] … notified BSIL … that since GSIS had determined that there was no valid reference obligation, that [Aon] had no obligation under the [BSIL/Aon CDS contract] and that consequently the actions taken

by GSIS did not constitute a 'Credit Event' [under the BSIL/Aon CDS contract]." Compl. ¶ 32.

7. The complaint says, "[The district court in *Ursa Minor* ] found, as a matter of law, that a 'Credit Event' as defined in the Credit [D]efault Swap Agreement between [Aon] and [BSIL] … had occurred in March 2000.

occurrence of a Credit Event as defined in one contract that there was a Credit Event as defined in the other. There is, as noted, no reason to assume that the risk transferred to Aon was precisely the risk that it transferred or sought to transfer to SG. And we can perceive of no basis for concluding that the district court's decision in *Ursa Minor* that there was a "Failure to Pay" Credit Event under the BSIL/Aon CDS contract implies that there was a "Sovereign Event" Credit Event under the Aon/SG CDS contract.

We therefore conclude that GSIS's default was not a "Sovereign Event" as that term is used in the Aon/SG CDS contract.

## III. "Failure to Pay"

The district court considered only one of the five kinds of Credit Events referred to in the Aon/SG CDS contract—the Sovereign Event. Finding that there had been such a Credit Event under the terms of the Aon/SG CDS contract, the court declined to consider whether the events also constituted a "Failure to Pay," which is also one of the defined Credit Events under that agreement.

■ "Although we ordinarily will not review an issue the district court did not decide, whether we do so or not is a matter within our discretion." *Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81, 88 (2d Cir.1996) (citing *Singleton v. Wulff*, 428 U.S. 106, 120–21, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976)). We think this case an appropriate one for exercising that discretion. Apparently as a result of the district court's conclusion that a Sovereign Event had occurred, the parties devote

little attention to the Failure to Pay issue in their briefs to us. But the parties amply presented arguments on that issue to the district court. In fact, there, the parties focused on the Failure to Pay language rather than the Sovereign Event provision upon which the district court eventually decided the motions. The interpretation of the unambiguous terms of a contract is, moreover, a matter of law that we may properly evaluate and decide ourselves. *See Krumme*, 238 F.3d at 139; *Chertkova*, 92 F.3d at 88.

■ As noted above, the Aon/SG CDS contract defines the "Reference Entity" as the "Republic of Philippines and any successors." Aon/SG CDS Contract at 1. Under the Aon/SG CDS contract, a *"Failure to Pay* means . . . the failure by the Reference Entity [*the Republic of Philippines* and any Successors] to make, when due, any payments equal to or exceeding the Payment Requirement (if any) under any Obligations." *Id.* at 1, 7 (second emphasis added). An "Obligation" under that agreement is: "With respect to the [Republic of Philippines], any obligation, (whether present or future, contingent or otherwise, as principal or surety or otherwise) for the payment or repayment of money." *Id.* at 2. The Reference Obligation is identified as:

Issuer/Borrower: Republic of Philippines

Maturity: April 15, 2008

Coupon. 8.8750%

Original Issue Amount: USD 500,000,-000

Since . . . a 'Credit Event' has occurred [with respect to the BSIL/Aon CDS contract,] . . . a 'Credit Event' has occurred under the [CDS contract] between [Aon] and [SG], since both agreements relied upon the same underlying documents and security." Compl. ¶ 39.

"[F]ailure by [SG] to acknowledge the occurrence of a valid credit event constitutes a breach of the [CDS contract] Agreement entered into between [SG] and [Aon]." Compl. ¶ 43.

*Id.* The Payment Requirement is "USD 5,000,000 or its equivalent in any other currency at the time of the Credit Event." *Id.*

Aon argues that GSIS itself qualifies as the "Reference Entity" of the Aon/SG CDS contract, that is, that "Republic of Philippines" includes GSIS.[8] GSIS's default on the Surety Bond, therefore, is a "Failure to Pay" by the Reference Entity on an Obligation of the Reference Entity. Aon contends that because the ISDA Credit Derivatives Definitions, incorporated into the Aon/SG CDS contract, *see* Aon/SG CDS Contract at 1, define "Sovereign" as "any state, political subdivision or government, or any agency, instrumentality, ministry, department or other authority (including, without limiting the foregoing, the central bank) thereof," the term "Republic of Philippines" must also include "any agency" of the state. Br. of Plaintiffs–Appellees at 29 (citing 1999 ISDA Credit Derivatives Definitions § 2.23, at 11).[9] We disagree.

It is clear from the face of the Aon/SG CDS contract that "Republic of Philippines" does not include GSIS or other government agencies like it.[10] There is no language in the Reference Entity definition, or anywhere else in the agreement as we read it, suggesting that it does, or indicating that it incorporates the ISDA definition of "Sovereign." To incorporate that definition of "Sovereign" into the definition of "Reference Entity," we would expect the parties to use that word, "Sovereign," in the relevant portion of the contract. They did not. Rather, they use the words "Republic of Philippines." Where the contract uses the word "Sovereign," in the term "Sovereign Event," by contrast, the contract does clearly mean to incorporate the ISDA definition. "Sovereign Event" is the only term in the Aon/SG CDS contract that refers not only to the Reference Entity, but to "the Reference Entity or any agency or regulatory authority thereof, including the central bank of the Reference Entity." Aon/SG CDS Contract at 7.

If we were to credit Aon's argument as to the expansive meaning of "Republic of Philippines," it would follow that any CDS contract listing a sovereign nation as a Reference Entity will be incorporating the ISDA definition of "Sovereign" without using the term, or at least that the contract is ambiguous in that regard. We are given, and ourselves see, no reason to do so.

Instead, we look to Philippine law for guidance about the distinction between the Republic of the Philippines and its agencies and instrumentalities. *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 626–27, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) ("[G]overnment instrumentalities established as juridical entities distinct from the sovereign should normally be treated as such."). Before the district court, SG offered uncontested expert evidence that, under Philippine law, GSIS is considered a juridical entity distinct from the Republic. Mem. in Support of Mot. for J. on the Pleadings dated Oct. 2, 2000, at 11 (citing

---

**8.** Aon does not argue that GSIS is a "Successor" to the Republic of the Philippines.

**9.** The Aon/SG CDS contract incorporates the 1991 ISDA Definitions (as supplemented by the 1998 Supplement). Aon/SG CDS Contract at 1. Both parties cite the 1999 ISDA Credit Derivatives Definitions, *see* Br. of Defendants–Appellants at 29; Br. of Plaintiffs–

Appellees at 29, which *amicus* explains "replicate[ ] in relevant part" the 1991 ISDA Definitions as supplemented by the 1998 Supplement. Br. of *amicus curiae* ISDA at 5.

**10.** Aon does not dispute that GSIS, which it agrees is an "agency" of the Philippines, is a separate juridical entity from the Republic of the Philippines.

Decl. of Cesar L. Villanueva dated Sept. 29, 2000). We conclude that, as a matter of Philippine law, GSIS is a separate juridical entity from the Republic of the Philippines. *See, e.g.,* An Act Amending Presidential Decree No. 1146, as amended, Expanding and Increasing the Coverage and Benefits of the Government Service Insurance System, Instituting Reforms Therein and For Other Purposes, Rep. Act No. 8291, § 41 (1997) (Phil.) (stating GSIS's powers and functions, including the power "to sue and be sued"); *see also Curley v. AMR Corp.,* 153 F.3d 5, 12 (2d Cir.1998) ("[A]ppellate courts, as well as trial courts, may find and apply foreign law."); Fed.R.Civ.P. 44.1 ("The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law."). As such, GSIS is not the "Republic of Philippines"; its obligations are not the Republic of the Philippines' obligations; and a failure by GSIS to make a payment on its obligations is not equivalent to the failure of the Republic of the Philippines to make a payment on its obligations.

To be sure, in the context of the argument that GSIS's failure to pay on the Surety Bond was a "Failure to Pay" as defined by the Aon/SG contract, Aon's assertion that the issue was decided by *Ursa Minor* appears to have more traction than when made in support of Aon's Sovereign Event argument. Although the *Ursa Minor* court did not address the question of whether a Sovereign Event had occurred—there was no such provision in the BSIL/Aon CDS contract—it *did* decide that there had been a "Failure to Pay" under that contract. Aon therefore argues that the *Ursa Minor* court's decision that there was a "Failure to Pay" under the

BSIL/Aon CDS contract foreclosed the district court—and forecloses us—under principles of issue preclusion (or collateral estoppel) from deciding that there was no "Failure to Pay" under the Aon/SG CDS contract.

But even though the identical term "Failure to Pay" is used in both CDS agreements, and the *Ursa Minor* court decided that there was a Failure to Pay under the BSIL/Aon agreement, the term "Failure to Pay" has distinctly different meanings in the two agreements. Under the BSIL/Aon CDS contract, which defines "Reference Entity" as "GSIS and any Successors and assigns," and "Obligation(s)" as the Surety Bond, *"Failure to Pay* means ... the failure by the Reference Entity [*GSIS* and any Successors and assigns] to make, when due, any payments under the Obligations [the Surety Bond] for whatever reason or cause." BSIL/Aon CDS Contract at 2, 4, 11 (first italics in original). As discussed above, the Aon/SG CDS contract, by contrast, defines "Reference Entity" as *"Republic of Philippines* and any Successors." In that contract, *"Failure to Pay* means ... the failure by the Reference Entity [*Republic of Philippines* and any Successors] to make, when due, any payments equal to or exceeding the Payment Requirement (if any) under any Obligations." Aon/SG CDS Contract at 1, 7 (first italics in original). Moreover, whereas the BSIL/Aon CDS contract defines "Obligation" as the Surety Bond, the Aon/SG CDS contract defines "Obligation" as "With respect to the Reference Entity [*Republic of Philippines* ], any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) for the payment or repayment of money." *Id.* at 2. Thus, the Aon/BSIL agreement explicitly covers failure to pay *by GSIS* on the *Surety Bond,* while the Aon/SG agreement explicitly does not do

so. It covers failure to pay *by the Republic of the Philippines* on obligations *of the Republic of the Philippines.*

■ One might argue, then, although the plaintiffs do not, that the Republic's statutory guarantee of GSIS's debt was an Obligation of the Reference Entity, which the Republic failed to pay when the Surety Bond came due on March 7, 2000, and that this failure to pay was a Credit Event, triggering SG's payment obligations under the contract. This argument would also fail. To trigger SG's payment obligations, a Credit Event must occur before the Termination Date of the CDS agreement, March 31, 2000. Aon/SG CDS Contract at 1. But Aon did not send a Notice and Demand to the Government of the Republic of the Philippines until April 3, 2000, three days after the Termination Date of the Aon/SG CDS contract. *See Société Générale,* 2005 WL 427535, at *2 n. 7, 2005 U.S. Dist. LEXIS 2719, at *9 n. 7. And the Republic of the Philippines did not deny Aon's demand until April 14, 2000, two weeks after the Termination Date. *Id.* Because the Republic's denial of liability did not occur before the Termination Date, it cannot constitute a Credit Event under the contract.

We therefore conclude that neither the default, which constituted a Failure to Pay under the BSIL/Aon CDS contract, nor the Republic's failure to honor its alleged statutory obligation, constituted a Failure to Pay under the Aon/SG CDS contract. For the same reasons, neither event constituted a "Repudiation." They similarly do not satisfy the other definitions of Credit Event enumerated in the Aon/SG CDS contract.

IV. Credit Event Notice

■ Although not central to the result we reach, we note that the contract also provides that SG is obligated to pay Aon only after Aon serves SG with a "Credit Event Notice" and a demand for payment. *See* Aon/SG ISDA Master Agreement, dated Feb. 9, 1999, at 5 (defining, as an "Event of Default," "[f]ailure by the party to make, when due, any payment under this Agreement ... *if* such failure is not remedied on or before the third Local Business Day *after notice of such failure is given to the party*" (emphasis added)); *see also* Mem. in Support of Pls.' Mot. for Sum. J., dated Oct. 17, 2000, at 13 (arguing that "[SG's] obligation is absolute and unconditional *upon a notice of a 'credit event'* and a demand for payment thereunder" (emphasis added)).

The district court concluded that Aon's March 22, 2000, letter constituted a Credit Event Notice. *Société Générale,* 2005 WL 427535, at *6, 2005 U.S. Dist. LEXIS 2719, at *19. We disagree. The Aon/SG CDS contract defines "Credit Event Notice" as "an irrevocable notice (which may be oral, including by telephone) to the parties and the Calculation Agent that describes the occurrence of a Credit Event on or after the Effective Date and on or prior to the Scheduled Termination Date." Aon/SG CDS Contract at 7. In the March 22 letter, which does not use the term "Credit Event Notice," Aon informed SG that GSIS had declined to make payments on the Surety Bond and that BSIL had made a demand on Aon pursuant to the BSIL/Aon CDS agreement. Letter from Aon to SG (Mar. 22, 2000), at 1. The letter outlined Aon's position:

> Recognizing this matter is not likely to settle itself, in an effort to get a resolution, we have this day filed suit in Chicago seeking a declaration of the rights and obligations of all relevant parties. In order to preserve our rights under [Aon]-Societe Generale [sic] agreement, we felt compelled to name you in the litigation; however, recognize our align-

ment of interests. If our position is upheld, you will not have to pay us. If we lose, you will owe us. We think our interests are the same, but again, for procedural reasons and to protect our rights in what we think would be the unlikely event we are called upon to pay BSIL, we named you....

In this vein, the [Aon/SG CDS contract] contains several procedural requirements which must be met for presentment to you on our agreement, such as presenting a claim to the Government of the Philippines and producing "Publicly available information." Out of an abundance of caution we are initiating those steps as part of our notification to you, but in light of our position there is no obligation on the underlying matter [sic], we would like to discuss with you whether we could dispense with those prerequisites.

*Id.* at 2.

To be a "Credit Event Notice," the action taken must be "irrevocable." Aon/SG CDS Contract at 7. The March 22 letter was not irrevocable. Aon went to great lengths to explain in the letter the circumstances under which it would rescind its contention that SG "owed" Aon and would agree that no Credit Event had occurred under either CDS contract and that neither Aon nor SG was obligated to pay under them. This letter was not a Credit Event Notice and therefore could not have triggered SG's payment obligations under the contract.

### CONCLUSION

As a matter of law and under the unambiguous language of the Aon/SG CDS contract, no Credit Event occurred thereunder and SG therefore did not breach that agreement by declining to pay Aon thereunder. We therefore reverse the judg-

ment of the district court and enter judgment in favor of SG.